IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 2:16-cr-00135-KKD-GMB |
| | ) | |
| ANDRES BUENDIA-SANTOS | ) | |

## REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

Pending before the court are the Motion to Suppress (Doc. 19) and Supplemental Motion to Suppress (Doc. 37) filed by Defendant Andres Buendia-Santos.   The court held an evidentiary hearing on the motions to suppress on July 25, 2016, and has reviewed the Government's responses to the motions (Docs. 25 & 39), along with Buendia-Santos' filings and supporting evidentiary materials (Docs. 20, 21 & 36).   For the reasons stated herein, the Magistrate Judge RECOMMENDS that the Motion to Suppress (Doc. 19) and Supplemental Motion to Suppress (Doc. 37) be DENIED.

## I.   BACKGROUND

A Grand Jury sitting within the Middle District of Alabama indicted Buendia-Santos on a single count for possession of a firearm while illegally residing in the United States. Doc. 1 at 1.   Buendia-Santos claims in his motions to suppress that the Government obtained the critical piece of evidence supporting this charge—the firearm itself—by illegally procuring his consent to search his truck. Doc. 19 at 1.

On the afternoon of February 17, 2016, Officer Brandon Hicks of the Troy Police Department was on patrol when he parked his police cruiser on Trojan Way, a street in Troy, Alabama, to radar for speeding motorists. Transcript of July 25, 2016 Hearing

("Tr.") at 54–56.   While there, Officer Hicks stopped Buendia-Santos for speeding. Tr. at 59.   After Buendia-Santos pulled over, Officer Hicks walked to Buendia-Santos' truck and stood by the driver's side door, where he began, "How you doing, sir?" Government's Exhibit 1 to July 25, 2016 Hearing ("Gov. Ex. 1") at 15:40:01.[1]   Buendia-Santos responded but his response is inaudible on the video recording.[2]   Officer Hicks then asked, "Do what?" and "Huh?" Gov. Ex. 1 at 15:40:05.   At the evidentiary hearing, Officer Hicks testified that he did not have any trouble understanding Buendia-Santos during this exchange; he only wanted Buendia-Santos to keep talking so that he could smell for alcohol on Buendia-Santos' breath since Officer Hicks could see a beer can on the passenger-side floorboard, could smell alcohol in the truck, and Buendia-Santos was speaking softly and facing away from him. Tr. at 59 & 66–67.   Officer Hicks eventually determined that Buendia-Santos had been drinking; however, a field sobriety test indicated he was not impaired, and therefore he was not arrested for driving under the influence. Tr. at 9 & 64.

Officer Hicks understood from Buendia-Santos' accent and broken English that English was not his first language. Tr. at 69–70.   Still, Officer Hicks was confident enough in his ability to converse with Buendia-Santos that he did not request a Spanish-language interpreter even though one was available. Tr. at 77.   This was because, throughout their encounter, Buendia-Santos appeared to Officer Hicks to be capable of

---

[1] All listed times reflect the time stamp on the video recording of the traffic stop that was admitted as evidence during the evidentiary hearing.   These times have not been authenticated as accurate and are included only for reference.

[2] Certain portions of the audio are muffled, obscured by background noise, or otherwise inaudible.   The transcriptions in this recommendation are verbatim to the extent possible.

conversing in English, to understand Officer Hicks' questions, and to give appropriate responses to the questions. Tr. at 59–61.   By way of example, Officer Hicks asked, "You got your insurance on the vehicle?" Gov. Ex. 1 at 15:41:35.   In response, Buendia-Santos immediately reached towards the passenger side of the vehicle, then presented a stack of paperwork to Officer Hicks. Gov. Ex. 1 at 15:42:00.   Officer Hicks later inquired, "What's your birthday, man?   What's your birthday?" Gov. Ex. 1 at 15:47:40. Buendia-Santos quickly responded, providing a date in 1976. Gov. Ex. 1 at 15:47:45. Officer Hicks then asked about a Mexican identification card that Buendia-Santos gave him earlier, inquiring "Where did you get that license?" Gov. Ex. 1 at 15:47:56. Buendia-Santos corrected him, "No, no license, no license.   Only my ID." Gov. Ex. 1 at 15:47:59.   During the entire traffic stop, Buendia-Santos never told Officer Hicks that he did not understand a question asked of him. *See generally* Gov. Ex. 1.

While Buendia-Santos was still sitting in his truck, he and Officer Hicks talked at length regarding his alcohol intake and place of residence, including the following exchange:

| | |
|---|---|
| Hicks: | Where you live at? |
| Buendia-Santos: | Close to a trailer park. |
| Hicks: | Okay.   What's your address? |
| Buendia-Santos: | Yeah, uh, no remember my address, you know. |
| Hicks: | How long you been living there? |
| Buendia-Santos: | Maybe five minutes. |

3

| | |
|---|---|
| Hicks: | No, *how long* you been living there? |
| Buendia-Santos: | Oh, how long?   One year. |
| Hicks: | You don't know your address and you've been living there for a year? |
| Buendia-Santos: | No . . . |
| Hicks: | You get any mail there? |
| Buendia-Santos: | No, sir.   No, uh, mail. |
| Hicks: | No mail? |
| Buendia-Santos: | No. |

Gov. Ex. 1 at 15:50:11–38.

After this exchange, Officer Hicks asked Buendia-Santos to step out of his vehicle. Gov. Ex. 1 at 15:50:38.   Buendia-Santos had his wallet in his hands as he stood up, and Officer Hicks instructed him to leave his wallet inside the vehicle. Gov. Ex. 1 at 15:50:56. Officer Hicks repeated this direction four times and also pointed to the truck before Buendia-Santos complied. Gov. Ex. 1 at 15:51:10.   A few seconds later, Officer Hicks said, "Okay, turn around and interlock your hands behind your head please." Gov. Ex. 1 at 15:51:20.   Buendia-Santos quickly turned around, but spread his fingers wide with his arms at his sides instead of crossing his fingers with his hands behind his head.   Officer Hicks continued, "Interlock your fingers behind your head." Gov. Ex. 1 at 15:51:20.   As he said this, Lieutenant Bryan Weed of the Troy Police Department, who had arrived on scene as back-up, gestured to show Buendia-Santos where to place his hands.   At this point, Buendia-Santos interlocked his fingers as directed. Gov. Ex. 1 at 15:51:21.   Officer

4

Hicks testified that it did not strike him as unusual that Buendia-Santos had to be told what to do multiple times. Tr. at 60.   He explained that drivers are routinely "nervous and forget what they're doing or what they're supposed to do" during traffic stops. Tr. at 69.

A short time later, Officer Hicks again asked Buendia-Santos where he lived, but Buendia-Santos only described the landmarks near his home. Gov. Ex. 1 at 15:53:26. Officer Hicks refused to accept this answer, continuing to ask Buendia-Santos repeatedly for an address. *E.g.*, Gov. Ex. 1 at 15:53:48.   Buendia-Santos eventually responded: "I say, 'Don't remember' every time . . . it's in my papers." Gov. Ex. 1 at 15:53:52.   A short time later, as Officer Hicks and Buendia-Santos talked at the rear of the truck, Lieutenant Weed approached Buendia-Santos from behind and placed a hand on his shoulder. Gov. Ex. 1 at 15:54:54.   Lieutenant Weed then began, "Mind if I look in your . . . ." Gov. Ex. 1 at 15:54:56.   At this time, Buendia-Santos was turned to his left, facing away from Lieutenant Weed and toward Officer Hicks, who said, "Can he go look in your vehicle?" Gov. Ex. 1 at 15:54:57; Tr. at 63 ("I said, He asked can he look in your vehicle.").   Officer Hicks testified that he repeated the question for clarification. Tr. at 63.   Officer Hicks and Lieutenant Weed did not pull their weapons or threaten Buendia-Santos at this time or any other time during the traffic stop. *See* Gov. Ex. 1; Tr. at 13.

After Officer Hicks asked Buendia-Santos if Lieutenant Weed could look in his vehicle, Buendia-Santos turned to his right to face Lieutenant Weed, who still had a hand on his shoulder.   Buendia-Santos was looking directly at Lieutenant Weed as Lieutenant Weed asked, "You mind if I look, look in your truck to see if there's any paperwork or

anything?" Gov. Ex. 1 at 15:54:58.   Buendia-Santos immediately responded, "Yeah, maybe right . . . ." Gov. Ex. 1 at 15:55:00.[3]   While verbally responding, Buendia-Santos also nodded his head, pointed at the passenger side of the truck, and took a step toward it. Officer Hicks then cut Buendia-Santos off, instructing him, "Step back here with me." Gov. Ex. 1 at 15:55:03.   Buendia-Santos quickly complied, assuming a position near the tailgate to watch the search.   Once there, Buendia-Santos pointed to the truck and offered, "Inside the, uh, little box," as he demonstrated to Officer Hicks by placing his hands approximately shoulder-width apart and parallel. Gov. Ex. 1 at 15:55:11.

Although he stood near the tailgate with Officer Hicks throughout the search, Buendia-Santos did not object to the search at any time.   After looking in the glove box for papers indicating Buendia-Santos' address, Lieutenant Weed looked on the passenger seat, and then behind the passenger seat. Tr. at 15–16.   He described the vehicle as being "in disarray," with assorted paperwork and other personal effects inside. Tr. at 16.   To look behind the seat, Lieutenant Weed folded the passenger seat forward.   As he did so, he immediately observed a firearm in a holster sitting on the floorboard. Tr. at 45.   When confronted with this discovery, Buendia-Santos explained that he had the gun because he works on a farm. Gov. Ex. 1 at 15:56:12.

The court held an evidentiary hearing on Buendia-Santos' motions to suppress, during which it received testimony from five individuals in addition to the two officers

---

[3] Officer Hicks testified, after watching the recording in court, that Buendia-Santos responded, "Yeah, no problem," rather than "Yeah, maybe right." Tr. at 73.   The court has reviewed the recording and does not hear the words "no problem."

involved in the traffic stop.   Dr. Adriana Flores, a forensic and clinical psychologist, testified regarding her interview and evaluation of Buendia-Santos. Tr. at 78.   Dr. Flores is fluent in English and Spanish and evaluated Buendia-Santos for an assessment of his English vocabulary and language skills. Tr. at 81; Defendant's Exhibit A to Hearing of July 25, 2016 at 1 ("Def. Ex. A" filed under seal).   Dr. Flores testified that Buendia-Santos was born and raised in Mexico in a Spanish-speaking home but emigrated to the United States eight and a half years ago. Tr. at 85.   He obtained approximately an eighth-grade education in Mexico and is of low-average intelligence with no significant impairments. Tr. at 104.   Buendia-Santos told Dr. Flores that he had been able to survive in the United States despite limited English comprehension because he usually worked construction jobs with Hispanic foremen. Tr. at 86.   In his most recent job, however, everyone else spoke only English, so he communicated through gestures, the few English words he knows, and a cell-phone application that translates Spanish to English. Tr. at 87–88; Def. Ex. A at 3–4.

After obtaining this and other background information, Dr. Flores attempted to evaluate Buendia-Santos' comprehension of a number of English phrases by asking a series of questions in English but allowing Buendia-Santos to respond in Spanish. Tr. at 93; Def. Ex. A at 6.   As Dr. Flores explained:

> I said to him, I said, you can respond in English or in Spanish, any way. I just need to gauge how much you understand of what I'm saying. So his responses were always in Spanish, actually, Your Honor.
> So I said: Did the officer at any point ask you whether he could search your vehicle? There was a long pause. And what he understood, and this is what he said was what he understood in Spanish: When the officer registered the vehicle.
> So then I asked a little differently. I said: Did the officer at any time

ask you for permission? And he responded that his understanding in Spanish was that if the officer asked my information.

I then said: If I asked you, would you mind, what am I asking? What am I saying? And he responded: Can you repeat, please?

So I said again. I said: If I ask you, would you mind, what am I asking? What am I saying? And his response was: What went through my mind, as in head. So he seemed to understand that mind refers to head.

Tr. at 93–94; Def. Ex. A at 6–7.   Based on her evaluation, Dr. Flores offered the opinion that Buendia-Santos did not understand that Lieutenant Weed was requesting permission when he asked if Buendia-Santos would "mind" if he looked in his truck. Tr. at 95.   She further opined that Buendia-Santos' inability to understand the request for consent was due to his limited English-language capability and the particular phrasing used, as well as Buendia-Santos' nervousness because of Officer Hicks' perceived frustration that he could not remember his home address. Tr. at 98–101.   Dr. Flores offered her interpretation that Buendia-Santos thought the officer was telling him he "was going to search the vehicle," not asking for permission to do so. Tr. at 101.

On rebuttal, the Government called Jerry Russell, Kevin Hood, and Earl Ellis. Tr. at 150–64.   Each testified that they worked with, or in Ellis' case employed, Buendia-Santos in his most recent job, and that they communicated with him in English. Tr. at 151, 160, 162–63.   Each man also testified that Buendia-Santos never used a translation application to communicate with them. Tr. at 152, 160, 164.   Blake Diamond, a Special Agent with the Department of Homeland Security, also testified. Tr. at 164.   Special Agent Diamond, who speaks English and has a working knowledge of Spanish, described conversing with Buendia-Santos after his arrest in both English and Spanish. Tr. at 169.

## II.   DISCUSSION

### A.   Voluntary Consent

Buendia-Santos first argues that his limited understanding of the English language prevented him from voluntarily consenting to the search of his truck.[4]   "Whether a suspect voluntarily gave consent to a search is a question of fact to be determined by the totality of the circumstances." *United States v. Blake*, 888 F.2d 795, 798 (11th Cir. 1989) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 249–50 (1973); *United States v. Chemaly*, 741 F.2d 1346, 1352 (11th Cir. 1984), *vacated*, 741 F.2d 1363, *reinstated on reh'g*, 764 F.2d 747 (11th Cir. 1985)).   "The government bears the burden of proving both the existence of consent and that the consent was not a function of acquiescence to a claim of lawful authority but rather was given freely and voluntarily." *Blake*, 888 F.2d at 798 (citing *United States v. Massell*, 823 F.2d 1503, 1507 (11th Cir. 1987)).   The Eleventh Circuit has provided trial courts with

> a non-exhaustive list of relevant factors to consider when making the assessment of whether consent to a warrantless search is voluntary: voluntariness of the defendant's custodial status, the presence of coercive police procedure, the extent and level of the defendant's cooperation with police, the defendant's awareness of his right to refuse to consent to the search, the defendant's education and intelligence, and, significantly, the defendant's belief that no incriminating evidence will be found.

*Blake*, 888 F.2d 798–99 (citing *United States v. Chemaly*, 741 F.2d 1346, 1352 (11th Cir. 1984)).   While these factors are appropriate guideposts, Buendia-Santos' voluntariness

---

[4]  Buendia-Santos' Supplemental Motion to Suppress (Doc. 37) presents the voluntariness of his consent as one ground for suppression and the "validity" of the consent as an independent ground.   Even so, his validity argument relies on factors incorporated in the voluntariness analysis. *See* Doc. 37 at 1–5.   As a result, the court addresses both arguments through the lens of Eleventh Circuit voluntariness jurisprudence.

argument does not fit neatly within these factors. *See, e.g.*, *Blake*, 888 F.2d at 799 (listing traditional "circumstances suggesting police coercion").

The leading Eleventh Circuit case on point is *United States v. Zapata*, 180 F.3d 1237 (11th Cir. 1999).   In *Zapata*, as here, the critical question was whether the defendant had "sufficient comprehension of English to provide voluntary consent." *Id.* at 1242.   The issue turned largely on the defendant's "ability to interact intelligently with the police." *Id.* (citations omitted).   Despite any deficit in English comprehension, the videotape of the traffic stop revealed the defendant "conversed at length" with the officer in English, and his "intelligent interaction with [the officer] indicates that he was capable of understanding that [the officer] was requesting his consent to search." *Id.*   Moreover, there was "no evidence" that the defendant "was confused by, or did not understand," the questions posed to him. *Id.*   As a result, the "purported limitations on [the defendant's] understanding of English did not preclude him from making 'an essentially free and unconstrained choice'" to consent to the search of his vehicle. *Id.*

Here, as in *Zapata*, the Government has met its burden of proving voluntary consent.   At the outset, the court finds that the question of whether Buendia-Santos voluntarily consented to the search must be viewed principally through the lens of objective reasonableness based on the facts known to the officers at the time of the traffic stop, rather than through an *ex-post* analysis of the officers' or Buendia-Santos' subjective beliefs, comprehension, or intent.   The Supreme Court has not explicitly mandated an objective analysis in this narrow context, as it has for analogous questions like the scope of

10

a consent or apparent authority over a dwelling. *E.g.*, *Florida v. Jimeno*, 500 U.S. 248, 250–51 (1991) (citations omitted) ("The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?"); *Illinois v. Rodriguez*, 497 U.S. 177, 188 (1990) ("[D]etermination of consent to enter must 'be judged against an objective standard: would the facts available to the officer at the moment . . . warrant a man of reasonable caution in the belief' that the consenting party had authority over the premises?") (citations and internal quotations omitted).

Undeniably, however, the voluntariness of a consent to search fits within the broader "scheme of the Fourth Amendment," which "becomes meaningful only when it is assured that at some point the conduct of those charged with enforcing the laws can be subjected to the more detached, neutral scrutiny of a judge who must evaluate the reasonableness of a particular search or seizure in light of the particular circumstances." *Terry v. Ohio*, 392 U.S. 1, 21 (1968).   In making the assessment here, as with investigative stops, "it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?" *Id.* at 21–22.   The rationale undergirding this objective test applies with equal force to the voluntariness of a consent, where an officer's "subjective good faith alone" provides precious little Fourth Amendment protection. *Beck v. Ohio*, 379 U.S. 89, 97 (1964).   Moreover, appellate decisions within the Eleventh Circuit and elsewhere imply an objective analysis, albeit

11

without expressly dismissing any proffered subjective evidence. *See, e.g.*, *Zapata*, 180 F.3d at 1242 (finding voluntary consent where the video of the traffic stop revealed the subject "conversed at length" in English and did not appear to be confused by the officer's questions); *United States v. Galvan-Muro*, 141 F.3d 904, 907 (8th Cir. 1998) (finding voluntary consent where the videotape of the subject's interaction with officers revealed that he "appeared to understand English"); *United States v. Hernandez*, 2013 WL 7035606, at *13 (N.D. Ga. Aug. 12, 2013), *adopted as modified*, 2014 WL 111211 (N.D. Ga. Jan. 13, 2014), *supplemented*, 17 F. Supp. 3d 1255 (N.D. Ga. 2014) (finding voluntary consent where the videotape of the subject's interaction with officers revealed that she answered questions appropriately and "apparently without any misunderstanding").   For all of these reasons, the court will employ an objective reasonableness test for determining whether Buendia-Santos' purportedly limited English comprehension prevented him from providing voluntary consent to search his vehicle.

The core question thus becomes whether the record evidence establishes that a reasonable police officer, armed only with the facts known to Officer Hicks and Lieutenant Weed at the time of the traffic stop, would have believed that Buendia-Santos was capable of understanding their request for consent to search his truck.   The court finds that it does. Officer Hicks had been talking with Buendia-Santos in English for fifteen minutes before the request for consent.   Throughout the conversation, Officer Hicks asked Buendia-Santos questions on a wide range of subjects, from insurance and alcohol intake to birth dates and other biographical information.   Not once did Buendia-Santos say that

he did not understand a question.   On the whole, Buendia-Santos' responses were appropriate in content, albeit delivered with imperfect grammar and diction, belying any claim that he did not intelligently interact with Officer Hicks and Lieutenant Weed. *See Zapata*, 180 F.3d at 1242.   There were some limited portions of the traffic stop where Buendia-Santos appears to have been confused because his verbal response did not accurately answer a question or he did not immediately submit to commands, but these were infrequent enough that the totality of the circumstances would have lead a reasonable officer to believe that Buendia-Santos understood English sufficiently to consent to the search of his truck. *See, e.g.*, *United States v. Guzman*, 454 F. App'x 531, 534 (8th Cir. 2012) (affirming district court's finding of voluntary consent where defendant "responded appropriately to most of the questions posed" despite a "language barrier" and "apparent lapses in communication"); *United States v. Zubia-Melendez*, 263 F.3d 1155, 1163 (10th Cir. 2001) (affirming district court's finding that defendant and officer "could converse sufficiently to understand one another" despite "acknowledge[ing] that [defendant] has trouble speaking and understanding English" and that "the videotape of the traffic stop demonstrates his confusion at several points during the encounter"); *United States v. Sanchez-Valderuten*, 11 F.3d 985, 990–91 (10th Cir. 1993) (affirming district court's finding that defendant understood English based on his "fair receptive English language skills" and despite his "difficulty speaking English" and the fact that "most of his responses to [the officer's] questions were in phrases or single words, and he sometimes simply did not respond to a question").   This is especially true where much of Buendia-Santos'

apparent confusion related to commands that Officer Hicks often has to repeat to nervous motorists, including those who speak English fluently.

Moreover, Buendia-Santos' conduct at the time of the search reinforces the conclusion that a reasonable person would believe he voluntarily consented to it.  In addition to responding verbally to the request to search, Buendia-Santos also nodded his head affirmatively and stepped toward the truck as if to assist the officer in the search. After returning to the tailgate, he continued to offer assistance to Lieutenant Weed, describing where to look and gesturing because he could not remember the English terminology "glove box."  Buendia-Santos stood by his truck throughout the search without objecting, further indicating his acquiescence in the search.  All of these actions are consistent with a finding that Buendia-Santos did in fact consent to have his vehicle searched. *See Guzman*, 454 F. App'x at 534 (noting defendant "did not object to the search once it had begun" in finding voluntary consent); *United States v. Galvan-Muro*, 141 F.3d 904, 907 (8th Cir. 1998) (finding defendant's "actions and demeanor observed on the video are consistent with a finding of voluntary consent" in that he "offered to open the trunk of the car" and "appeared quite cooperative and did not object to the search"); *Sanchez-Valderuten*, 11 F.3d at 990–91 (holding that "defendant's conduct indicates he freely consented to a search of the vehicle" because he "stood by as the officer searched the car, and he assisted the officer in moving bags and opening the tailgate and passenger door"); *United States v. Corral*, 899 F.2d 991, 994 (10th Cir. 1990) (finding voluntary consent in part because both subjects watched the search without objection).

14

To disprove voluntary consent, Buendia-Santos points to *United States v. Tapia*, 912 F.2d 1367 (11th Cir. 1990), but the district court's finding of invalid consent in that case was not challenged on appeal. *Id.* at 1370.   Buendia-Santos also relies on Dr. Flores' opinion that he did not comprehend the precise question asked of him because he understood "mind" only as a synonym of "head."   Leaving aside that Officer Hicks did not use the word "mind" when he repeated the question, the court finds Dr. Flores to be well-qualified and competent, and her testimony persuasive.   Still, her *ad hoc* evaluation of Buendia-Santos' English comprehension is precisely the type of subjective analysis that the Supreme Court counseled against in *Terry*, 392 U.S. at 21.   Just as the officers' subjective belief that Buendia-Santos understood English cannot carry the day, neither can evidence of Buendia-Santos' subjective misunderstanding that was not and should not have been apparent to the officers at the time of the traffic stop. *Cf. Beck*, 379 U.S. at 97. To hold otherwise would place an unfair burden on law enforcement personnel and undoubtedly lead to the suppression of legally obtained evidence on a minimal and easily manufactured showing of subjective incomprehension.[5]

Having found that a reasonable officer would have believed Buendia-Santos comprehended the request for consent, the court finds that the consent was voluntary. With reference to the factors listed in *Blake*, 888 F.2d at 798, and first catalogued in *Schneckloth*, 412 U.S. at 226, the video recording of the traffic stop reveals the officers did

___

[5] Moreover, there is at least some reason to question the information Buendia-Santos provided to Dr. Flores, as each of his co-workers testified that he had a working knowledge of English and did not resort to the use of a translator application, as he had conveyed to Dr. Flores.   This contradicting testimony undercuts some of the persuasive value of Dr. Flores' evaluation.

not pull their weapons, threaten Buendia-Santos, or otherwise attempt to intimidate or to coerce him to consent to the search. *E.g.*, *United States v. Navarro*, 2009 WL 2993863, at *2–3 (M.D. Ala. Sept. 17, 2009).   The court finds that Buendia-Santos "was detained for a relatively short period of time and the environment in which consent was given was not oppressive." *Id.* (citing *United States v. Espinosa-Orlando*, 704 F.2d 507, 513 (11th Cir. 1983); *Berkemer v. McCarty*, 468 U.S. 420, 438–39 (1984) ("[D]etention of a motorist pursuant to a traffic stop is presumptively temporary and brief.")).   His education and intelligence, though somewhat limited, do not compel the conclusion that Buendia-Santos was particularly susceptible to coercion, and his helpful demeanor during the encounter is inconsistent with such a finding.   The video recording does reveal that Buendia-Santos appeared to know that the firearm was in his truck, but there is no evidence that Buendia-Santos was aware that his immigration status prohibited him from possessing it. While the officers could have been more careful to confirm Buendia-Santos' consent, such as by calling in an interpreter, using a Spanish-language written consent form, or specifically advising Buendia-Santos of his right to refuse consent, given the totality of the circumstances the failure to employ any of these tactics does not undermine the finding that Buendia-Santos' consent was "the product of an essentially free and unconstrained choice." *United States v. Garcia*, 890 F.2d 355, 360 (11th Cir. 1989); *Schneckloth*, 412 U.S. at 227 ("While knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the *sine qua non* of an effective consent.").   For all of these reasons, the court recommends that Buendia-Santos'

16

motions to suppress on voluntariness grounds be denied.

**B.      Scope of Consent**

As with the voluntariness analysis, the question of "whether there were any limitations placed on the consent given and whether the search conformed to those limitations is to be determined by the totality of the circumstances." *Blake*, 888 F.2d at 798 (citing *United States v. Milian-Rodriguez*, 759 F.2d 1558, 1563–64 (11th Cir. 1985)). "The scope of a consent search is defined by the scope of actual consent in the same way that the scope of a search based upon a search warrant is defined by the warrant." *United States v. McBean*, 861 F.2d 1570, 1573 (11th Cir. 1988) (citations omitted); *Jimeno*, 500 U.S. at 251 ("The scope of a search is generally defined by its expressed object.").   Here, the expressed purpose of the search was "to see if there's any paperwork or anything" indicating Buendia-Santos' physical address.

Once Buendia-Santos granted permission to search the vehicle for paperwork with his address, that permission extends to "any compartment or container therein that might reasonably contain the objects of the search." *United States v. Martinez*, 949 F.2d 1117, 1120 (11th Cir. 1992) (citing *United States v. Susini*, 261 F. App'x 270, 273 (11th Cir. 2008)); *Jimeno*, 500 U.S. at 251 ("We think that it was objectively reasonable for the police to conclude that the general consent to search respondent's car included consent to search containers within that car which might bear drugs.").   In addition, "it is well-settled that 'objects falling in the plain view of an officer who has a right to be in the position to have that view are subject to seizure and may be introduced into evidence.'" *Susini*, 261 F.

17

App'x at 273 (quoting *Harris v. United States*, 390 U.S. 234, 236 (1968)). Buendis-Santos' consent authorized Lieutenant Weed to search inside his vehicle and to open any compartment that might contain paperwork indicating his address.[6]   Lieutenant Weed did just that—first looking in the glove compartment and then in the passenger compartment of the truck.   While doing so, he saw the firearm in plain view.   This search did not exceed the scope of Buendia-Santos' consent, and the court recommends denial of the motions to suppress on this basis as well.

## III.   CONCLUSION

Accordingly, it is the RECOMMENDATION of the Magistrate Judge that the Motion to Suppress (Doc. 19) and Supplemental Motion to Suppress (Doc. 37) be DENIED.

It is further ORDERED that the parties are DIRECTED to file any objections to this Recommendation on or before **September 6, 2016.**   Any objections filed must identify the specific findings in the Magistrate Judge's recommendation to which the party is objecting.   Frivolous, conclusive, or general objections will not be considered by the district court.   The parties are advised that this recommendation is not a final order of the court, and therefore it is not appealable.

Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's report shall bar the party from a *de novo* determination by the

---

[6]  Buendia-Santos argues that Lieutenant Weed should have been "confined to the glove compartment or the center console, which is where most people keep their documents." Doc. 37 at 7.   He offers no support in the record or caselaw for grafting artificial limitations on the scope of a search in this manner.

district court of issues covered in the report and shall bar the party from attacking on appeal factual findings in the report accepted or adopted by the district court except upon grounds of plain error or manifest injustice. *See Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982); *Stein v. Reynolds Secs., Inc.*, 667 F.2d 33 (11th Cir. 1982).

DONE this 29th day of August, 2016.

/s/ Gray M. Borden
UNITED STATES MAGISTRATE JUDGE